UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANK ALEO,

           Plaintiff,

    v.

C. SMITH, et al.,

           Defendants.

No.  2:13-cv-1673 GEB KJN P

FINDINGS AND RECOMMENDATIONS

I. Introduction

      Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff raises Eighth Amendment claims against defendants Barnett, Fong, Heatley, Zamora, and Smith.  Defendants' motion for summary judgment is before the court.  As set forth more fully below, the undersigned concludes that defendants' motion for summary judgment should be granted.

II. Plaintiff's Amended Complaint

      In his verified complaint, plaintiff alleges the following.  Since an "advanced sling" procedure was performed, he has suffered serious complications, including failure of the advanced sling, and contends that defendants have done nothing to alleviate his pain and suffering.  Defendants allegedly denied him an "artificial urinary sphincter," which plaintiff claims was ordered by Dr. Beck.  Plaintiff's primary care physician, defendant Dr. Barnett, allegedly refused to provide plaintiff with medical treatment for his pain, chronic condition, and

1

problems which affected his daily life.  (ECF No. 1 at 6.)  Defendant Heatley allegedly refused to provide plaintiff medical care to alleviate his pain and suffering.  Defendants Fong and Zamora reviewed plaintiff's medical file and appeals and allegedly denied plaintiff medical care, including the necessary surgery that prior surgeons and specialists agreed was required.  (ECF No. 1 at 7.)  Plaintiff contends that he was left with a hernia, severe pain, and the serious inability to perform basic daily functions.  Plaintiff argues that defendants are part of the Medical Authorization Review ("MAR") Committee, which on two separate occasions denied plaintiff the "artificial urinary sphincter" based on "cost, prison policy, or simple indifference."  (ECF No. 1 at 5.)  Plaintiff included state law claims of negligence, refusal to treat, and medical malpractice. (ECF No. 1 at 8.)

III.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the grounds that plaintiff has not met the objective or subjective components of a claim for deliberate indifference to medical care, and that the risks of the artificial urinary sphincter surgery outweighed the unlikely-to-be-realized benefits.  Further, defendants contend that they are entitled to qualified immunity.  As to the state law claims, defendants argue that plaintiff has failed to show compliance with the Government Claims Act; that the court should decline to exercise supplemental jurisdiction if the Eighth Amendment claim is dismissed; and that in any event, there is no actionable negligence, refusal to treat, or medical malpractice claims.

In opposition, plaintiff complains that defendant Heatley cannot claim he was willing to provide the artificial urinary sphincter surgery, and then be part of the MCSP MAR Committee that denied the surgery because it demonstrates bias.  Plaintiff also objects that defendants Fong and Zamora are not medical professionals and should not be responsible for addressing medical appeals, but because the CDCR allows them to, argues that they are equally responsible for denying plaintiff the needed medical care.  Moreover, plaintiff disputes defendants' position that he does not have pain or a significant disability, and cites defendants' Exhibit 8 (ECF No. 36-9 at 2-4) as evidence that defendants were aware of his pain and suffering.  (ECF No. 39 at 4.) Plaintiff adds that his hernia was never addressed.  Plaintiff further contends that defendant Dr.

2

Barnett was required to authorize the artificial urinary sphincter surgery because plaintiff met the applicable criteria:  (1) health care decided by the attending physician to be reasonable and needed to prevent pain, suffering, or significant disability; and (2) supported by health outcome data as effective medical care.  (ECF No. 39 at 5.)  Plaintiff argues that defendant Dr. Barnett based her denial on complete speculation as to what might happen in the future, citing "risks of erosion, infection, and nerve compression."  (ECF No. 39 at 6.)  Plaintiff points out that he already suffers from infection and pain.  Plaintiff contends that defendants are merely engaging in semantics and asserts that plaintiff's primary care physician, as well as two other specialists, Dr. Beck and Dr. Fawcett, recommended that plaintiff receive the artificial urinary sphincter procedure.

Plaintiff argues that defendants are not entitled to qualified immunity because the Eighth Amendment right to medical care was well-established, and each disregarded plaintiff's obvious pain and suffering.  Finally, with regard to his state law claims, plaintiff contends that his deposition testimony confirms that plaintiff filed a Government Tort Claim based on the letter he received from the Board stating that the Board would act on plaintiff's claim at the August 16, 2012 hearing, and would reject the claim on that date.  (ECF No. 39 at 7, citing to Pl.'s Dep. at 85-86 (ECF No. 36-2 at 65-66).)  Plaintiff argues that defendants must now prove that he did not properly exhaust his state law claims.  He contends that his state law claims should be decided on the evidence, not on the "boilerplate denials by the defendants."  (ECF No. 39 at 8.)

Finally, plaintiff contends that a four year refusal to provide plaintiff with the artificial urinary sphincter surgery, despite the recommendations of at least three doctors constitutes deliberate indifference to his serious medical needs, and is not a mere difference of opinion due to the opinions of those three doctors.

In reply, defendants argue that following the initial prostate removal surgery by an outside doctor, which plaintiff claims was "botched," plaintiff became incontinent.  Subsequently, several medical procedures were performed to attempt to alleviate the incontinence, none of which worked.  Although plaintiff now wants to try yet another procedure, the "artificial urinary sphincter" procedure, defendants contend that such procedure was evaluated and determined to be

3

1    unlikely to be successful and could make things worse.  Defendants argue that such evaluation

2    does not demonstrate deliberate indifference.  Defendants also dispute plaintiff's characterization

3    of Dr. Heatley's position.  Defendants claim that Dr. Heatley was not willing to provide the

4    procedure but presented the issue to additional medical personnel.  Defendants Fong and Zamora

5    were not deliberately indifferent because they did not deny the procedure.  Defendants point out

6    that plaintiff attributes his pain to the "botched" surgery and the "many unnecessary surgeries due

7    to the initial botched procedure."  (ECF No. 41 at 2, citing ECF No. 39 at 4.)  Defendants note

8    that plaintiff does not report problems with the catheter, and does not dispute that he has had a

9    total of three infections in five years at the catheter site, each of which cleared up after two or

10   three days.  (ECF No. 41 at 2, citing Pl.'s Dep. at 25; 32; 84 (ECF No. 36-2 at 4-5; 12-13, 64.)

11   Defendants argue that plaintiff's pain complaints originate from an unrelated source which would

12   not be helped by the artificial urinary sphincter.  Defendants contend that having to wear a

13   catheter does not cause significant injury or unnecessary and wanton infliction of pain; thus,

14   plaintiff fails to meet the objective component of his Eighth Amendment claim.

15        With regard to plaintiff's statement that his hernia has not been addressed, defendants

16   argue that plaintiff testified that there is no connection between the hernia and receiving an

17   artificial urinary sphincter.  (ECF No. 41 at 3, citing Pl.'s Dep. at 31 (ECF No. 36-2 at 11).)

18   Thus, the hernia is not at issue here.

19        Defendants dispute plaintiff's position that Dr. Barnett was required to authorize the

20   procedure because defendants point to evidence demonstrating that the specialists discussed, but

21   did not recommend, the artificial urinary sphincter procedure, which amounts to a difference of

22   opinion between health care providers.  (ECF No. 41 at 3)  Plaintiff does not dispute that the

23   artificial urinary sphincter "procedure is not supported by health outcome data as effective

24   medical care in his case."  (ECF No. 41 at 3.)  It is undisputed that defendant Barnett was part of

25   a subcommittee, made up of seven board-certified physicians, who reviewed plaintiff's medical

26   records, evaluated medical literature, and unanimously determined that the risks of the surgery

27   outweighed the unlikely-to-be-realized benefits.  Thus, the decision not to provide the artificial

28   urinary sphincter procedure is a difference of opinion, not rising to the level of deliberate

4

1    indifference.  Finally, defendants argue they are entitled to qualified immunity because a

2    reasonable person could not believe that plaintiff had a constitutional right to be given a

3    problematic and likely ineffective surgery, based on the chance that he might not have to wear a

4    catheter which, while uncomfortable, does not cause severe pain or lead to further injury.  (ECF

5    No. 41 at 4.)

6            With regard to plaintiff's state law claims, defendants reply that because plaintiff failed to

7    allege compliance with the Government Tort Claims Act in his complaint, his claims should be

8    dismissed.  In the alternative, defendants argue that the court should decline to exercise

9    supplemental jurisdiction or find that plaintiff failed to rebut defendants' evidence.  (ECF No. 41

10   at 4.)

11   IV.  Legal Standard for Summary Judgment

12           Summary judgment is appropriate when it is demonstrated that the standard set forth in

13   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

14   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

15   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

16   initial responsibility of informing the district court of the basis for its motion, and identifying

17   those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

18   together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

19   of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered

20   Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

21   party need only prove that there is an absence of evidence to support the non-moving party's

22   case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

23   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

24   56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have

25   the trial burden of production may rely on a showing that a party who does have the trial burden

26   cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

27   judgment should be entered, after adequate time for discovery and upon motion, against a party

28   who fails to make a showing sufficient to establish the existence of an element essential to that

1   party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

2   U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

3   party's case necessarily renders all other facts immaterial."  Id. at 323.

4         Consequently, if the moving party meets its initial responsibility, the burden then shifts to

5   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

6   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

7   establish the existence of such a factual dispute, the opposing party may not rely upon the

8   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

9   form of affidavits, and/or admissible discovery material in support of its contention that such a

10   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

11   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

12   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

13   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

14   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

15   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

16   (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

17   1564, 1575 (9th Cir. 1990).

18         In the endeavor to establish the existence of a factual dispute, the opposing party need not

19   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

20   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

21   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

22   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

23   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

24   amendments).

25         In resolving a summary judgment motion, the court examines the pleadings, depositions,

26   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

27   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

28   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on March 13, 2015 (ECF No. 36-15), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V.  Facts[1]

1.  On July 7, 2008, plaintiff had prostate removal surgery by an outside doctor.

2.  During the 2008 surgery, a needle broke off inside plaintiff.

3.  According to plaintiff, the 2008 surgery was "botched," and had a devastating effect on his health, with residual and ongoing problems.

4.  Plaintiff had to be cut open and "cut through a bunch of stuff" to get the needle; otherwise, the surgery would not have been very invasive because it was to be robotic.

5.  After the operation, plaintiff was gaining control of urination, and then one day he could not urinate causing him tremendous pain.

6.  As a result, an outside doctor stuck a stainless steel rod in the catheter and shoved it in, and it was like a weight lifting off plaintiff; later, the outside doctors "roto-rootered" his urethra. (Pl.'s Dep. at 35-36 (ECF No. 36-2 at 16).)

---

[1]  For purposes of the pending motion, the following facts are found undisputed, unless otherwise indicated.  Documents submitted as exhibits are considered to the extent that they are relevant, and despite the fact that they are not authenticated because such documents could be admissible at trial if authenticated.

7.  Plaintiff has suffered pain in his lower stomach ever since the prostate surgery, which he attributes to the needle breaking off during the surgery.

8.  Plaintiff has worn a catheter since the 2008 prostate-removal operation due to incontinence.

9.  On October 22, 2008, plaintiff had a cystoscopy by an outside doctor to address incontinence, but it did not work.

10.  On November 24, 2008, plaintiff received a direct vision internal urethomy [sic], bladder biopsy, fulguration,[2] and removal of bladder calculi.

11.  The report from that day indicated that if plaintiff's incontinence did not improve, plaintiff might need a bulking agent, an artificial urinary sphincter, or a sling procedure.

12.  On March 9, 2009, plaintiff requested that the catheter he was using be replaced with a condom catheter.[3]

13.  Plaintiff received the condom catheter shortly thereafter.  In his deposition, plaintiff states that he must wear the condom catheter 24 hours a day.  (Pl.'s Dep. at 83 (ECF No. 36-2 at 63).)

14.  Sometime before July 21, 2010, plaintiff received a bulking agent to try to help with incontinence, but that did not work.

15.  On July 21, 2010, plaintiff received a sling procedure to address incontinence, but it did not work, and made plaintiff's stomach pain worse for about a month; then the pain returned to the same level.

16.  In a September 29, 2010 progress note, Dr. Beck, an outside urologist, wrote on the form the following (in quotes):

---

[2]  Fulguration is the destruction of tissue by means of high-frequency electric current.  Stedman's Medical Dictionary 356760 (Nov. 2014).  In his deposition, plaintiff explained that he had bladder stones and these procedures were used to remove them, and were unrelated to his incontinence.  (ECF No. 36-2 at 20-21.)

[3]  "A condom catheter is an external urinary collection device that fits over the penis and is used to manage urinary incontinence."  Cason v. Wexford Health Services, Inc., 2014 WL 6391048, *3 n.8 (D. Md. Nov. 14, 2014).

Consultation/Treatment Report:  "Recent advance sling failed.  He is using a condom cath[eter].  We had discussion about inflatable artificial sphincter.  I would rather he has 2nd opinion & surgery at UC but am willing to do surgery locally."

Recommendations/Plan:  "Refer to UC Davis for inflatable sphincter."

(ECF No. 36-7 at 2.)

17.  Dr. Beck did not discuss complications or failure rates for the artificial urinary sphincter with plaintiff.  (Pl.'s Dep. at 50-52 (ECF No. 36-2 at 31-32).)

18.  Dr. Naseer,[4] plaintiff's primary care physician at MCSP, requested that plaintiff be approved for the artificial urinary sphincter surgery to help with incontinence.[5]  (Pl.'s Dep. at 60 (ECF No. 36-2 at 40).)

19.  On May 9, 2011, the artificial urinary sphincter procedure was denied through a request for treatment/consultation, signed by defendant Dr. Heatley for defendant Dr. Smith, and which indicated that the MAR Committee at MCSP denied the request.  (ECF No. 36-8 at 2.)

20.  Dr. Heatley was present at this MAR Committee, which is made up of a registered nurse and all the medical doctors at MCSP who are available to attend the committee meeting.

21.  The procedure was denied based upon InterQual and California Code of Regulations title 15, sections 3350 to 3370.  (ECF No. 36-8 at 2.)

22.  Section 3350 outlines medical services for inmates, stating that inmates shall only receive medical services that are based on medical necessity and supported by outcome data as effective medical care, where "medical necessity" is defined as:  "[H]ealth care services that are

_____

[4]  Both parties refer to plaintiff's primary care physician as "Dr. Nasser."  (ECF Nos. 36-1 at 7; 39 at 11.)  However, defendants provided a copy of the doctor's first level appeal response, which reflects "S. Naseer, MD" in two separate places.  (ECF No. 36-10 at 2.)  The California Department of Consumer Affairs lists two doctors bearing the name "S. Nasser," neither of whom reflect addresses in California (https://www.breeze.ca.gov).  There are two doctors with the name "S. Naseer," one of whom is located in Stockton, Dr. Sahir Naseer, with areas of practice in family medicine (primary) and internal medicine (secondary).  Dr. Saad Naseer lists an address in St. Louis, Missouri, with a primary practice in radiology.  Id.  Thus, the court will refer to Dr. S. "Naseer" herein.

[5]  It is unclear whether Dr. Naseer's request was made in writing because the request was not provided by the parties.

1   determined by the attending physician to be reasonable and necessary to protect life, prevent

2   significant disability, or alleviate severe pain, and are supported by health outcome data as

3   effective medical care." (ECF No. 36-8 at 2.)

4       23.   Dr. Smith has researched whether he was present at the MAR Committee at MCSP

5   that denied plaintiff's request for an artificial urinary sphincter and believes he was not -- and that

6   this is why Dr. Heatley signed for him. (Smith Decl. at 2 (ECF No. 36-17 at 2).)

7       24.   The only basis for plaintiff's claim against Dr. Smith is the May 9, 2011 Request for

8   Treatment/Consultation that was signed by Dr. Heatley for Dr. Smith. (Pl.'s Dep. at 60-62; 67;

9   87 (ECF No. 36-2 at 40-42; 47; 67).)

10      25.   On or about May 24, 2011, plaintiff submitted a grievance asking that the denial of

11   the artificial urinary sphincter surgery be reviewed and that the surgery be approved.

12      26.   The surgery was to address incontinence and pain from the catheter. (Pl.'s Dep. at 64

13   (ECF No. 36-2 at 44).)

14      27.   In the First Level Appeal Response to that grievance, Dr. S. Naseer indicated that he

15   had interviewed plaintiff "face to face" on June 29, 2011, and reviewed plaintiff's Unit Health

16   Record. Dr. Naseer stated that he had "appealed the decision for denial of urinary artificial

17   sphincter on [plaintiff's] [behalf]," and that plaintiff's request would be discussed during the next

18   MAR Committee meeting. (ECF No. 36-10.) Dr. Naseer partially granted plaintiff's request.

19   (Id.)

20      28.   The August 10, 2011 Second Level Appeal Response to the grievance, signed by

21   defendant Dr. Heatley for defendant Fong, granted the appeal in part, and indicated that plaintiff

22   would receive the artificial urinary sphincter if the renewed request was approved by the prison's

23   MAR Committee. (Pl.'s Dep. at 65, 68 (ECF No. 36-2 at 45; 48); Heatley Decl. (ECF No. 36-21

24   at 2); (ECF No. 36-11).)

25      29.   Defendant Fong is a Chief Executive Officer ("CEO") hospital administrator with a

26   Masters in Public Health ("MPH"), not a medical doctor.

27      30.   Defendant Fong was not a part of any MAR Committee at MCSP or any other prison.

28   ////

10

31.  During the relevant time period, defendant Fong assigned Dr. Heatley, who was Chief Medical Executive at MCSP and a medical doctor, to review all medical grievances as his designee.  (ECF No. 36-18 at 2.)

32.  Defendant Fong's name was on the Second Level Response because it was CDCR's policy to have the CEO's name there, but Fong would not decide the medical issues.

33.  Defendant Fong would have medical doctors decide the medical issues.

34.  The only basis for plaintiff's claim against defendant Fong is the Second Level Response to the grievance that was signed by Dr. Heatley for defendant Fong.

35.  On August 17, 2011, plaintiff was seen by Dr. Fawcett of Alvarado Hospital in San Diego, via telemedicine consultation, in response to the MAR Committee's review of whether to grant plaintiff's renewed request for the artificial urinary sphincter surgery.  (ECF No. 36-12.)

36.  At that appointment, plaintiff was told that the artificial urinary sphincter can fail, that it can erode or atrophy the urethra and become ineffective, that it could be damaged by passage of a urethral catheter, that there was at least a 40% redo rate, that the operation should be done by a urologist with a subspecialty in reconstructive urology and by doctors who have a special interest in the sphincter implantation, and that the surgery could be complicated.  (Pl.'s Dep. at 70-71 (ECF No. 36-2 at 50-51); (ECF No. 36-12 at 3).)

37.  This above information in paragraph no. 36 was also reflected in Dr. Fawcett's report. (ECF No. 36-12.)

38.  In his report, Dr. Fawcett noted that plaintiff

> is having problems with the condom where the skin is irritated and bleeding at times.  It is painful and sore.  He continues to work, and he really wants to be active and work, and the incontinence problem is making this almost impossible.  He would therefore request attention so that he may deal with the problem.

(ECF No. 36-12 at 2.)

39.  Dr. Fawcett never told plaintiff that the artificial urinary sphincter would help with any pain besides that associated with no longer having to use a catheter if the operation was successful.  (Pl.'s Dep. at 73-74 (ECF No. 36-2 at 51, 54).)

////

40.  In further evaluating plaintiff's renewed request for the artificial urinary sphincter surgery and from reviewing plaintiff's medical records, it was Dr. Heatley's understanding that plaintiff was functional in that he could perform activities of daily living, but he had to use a catheter.

41.  Dr. Heatley considered that a catheter can cause discomfort, but should not cause severe pain, and any infections or rashes caused by the catheter can be treated with antibiotics and topical medications.

42.  Dr. Heatley also considered that plaintiff had several previous failed procedures and surgeries to eliminate incontinence, that the artificial urinary sphincter could fail, that it was complicated and risky, and that it had a fairly high redo rate.

43.  Dr. Heatley was concerned about subjecting plaintiff to a procedure that would be unsuccessful and would result in even more discomfort to him.

44.  There was no medical indication that plaintiff needed the artificial urinary sphincter surgery to protect his life, to prevent significant disability, or to alleviate severe pain, and the health outcome data did not show that the surgery would likely be effective in eliminating plaintiff's incontinence.

45.  However, the MCSP MAR Committee decided not to deny plaintiff's renewed request for an artificial urinary sphincter outright, but instead chose to send the request to the medical review committee in Sacramento, so plaintiff could receive another evaluation to ensure that the concerns about the surgery were valid, and that the decision could be made at a higher level with additional medical personnel evaluating the procedure.

46.  The Third Level Response to the grievance, signed by defendant Zamora, indicated that the MCSP MAR Committee referred plaintiff's request for the artificial urinary sphincter surgery to the California Correctional Health Care Services Health Care Review Subcommittee, and that MCSP was to provide evidence that it received that Subcommittee's determination regarding whether or not the artificial urinary sphincter surgery would be provided.

47.  It was plaintiff's understanding that defendant Zamora wanted plaintiff to receive a response to the referral to the California Correctional Health Care Services Health Care Review

12

1    Subcommittee in Sacramento to which MCSP referred his request.  (Pl.'s Dep. at 75 (ECF No.

2    36-2 at 55).)

3         48.  The only basis for plaintiff's claim against defendant Zamora is the Third Level

4    Response to the grievance.

5         49.  Defendant Zamora is not a medical doctor, and she relied upon the Health Care

6    Services Health Care Review Subcommittee, which was made up of seven board certified

7    medical physicians, to determine whether the artificial urinary sphincter surgery was medically

8    necessary.

9         50.  Plaintiff received a response from the Health Care Review Subcommittee, dated

10   January 9, 2012, signed by defendant Barnett.

11        51.  The Health Care Review Subcommittee decision indicated that plaintiff's request for

12   artificial urinary sphincter surgery was reviewed and denied as not medically necessary,

13   "medically necessary" meaning health care services that are determined by the attending

14   physician to be reasonable and necessary to protect life, prevent significant illness or disability, or

15   alleviate severe pain.

16        52.  The decision also noted that plaintiff had symptomatic coronary artery disease which

17   placed him at a higher risk during surgery.

18        53.  The Health Care Review Subcommittee that reviewed plaintiff's request for an

19   artificial urinary sphincter surgery was made up of seven board certified medical physicians,

20   including Dr. Barnett.

21        54.  The Health Care Review Subcommittee oversees Utilization Management policies,

22   procedures, criteria selections, and standards, and performs the fourth and final level of review

23   and appeal for any requests for medical services sent to it.

24        55.  In connection with its decision to deny plaintiff artificial urinary sphincter surgery,

25   the Health Care Review Subcommittee reviewed plaintiff's medical files.

26        56.  Plaintiff's medical files indicated that plaintiff could perform activities of daily living

27   with the use of a catheter, and that plaintiff had several previous procedures and surgeries that had

28   been unsuccessful in eliminating incontinence.

57.  The Health Care Review Subcommittee also considered that incontinence itself should not cause pain, but that a condom catheter can cause episodic skin irritations, but that these, and infections, can be treated.

58.  The Health Care Review Subcommittee considered relevant medical literature regarding the artificial urinary sphincter for someone with several prior failed procedures and surgeries to eliminate incontinence.

59.  The medical literature indicated that an artificial urinary sphincter has risks of erosion, infection, and nerve compression, all of which can be extremely painful, the procedure could fail, that it was complicated and risky, and that it had a fairly high redo rate, and that if the artificial urinary sphincter did not work completely, the patient would have to continue using a condom catheter.

60.  The Health Care Review Subcommittee also considered that, like any surgery, the artificial urinary sphincter surgery would expose plaintiff to the risk of infections, further pain, or even death.

61.  Additionally, the Health Care Review Subcommittee considered that plaintiff had symptomatic coronary artery disease, which placed him at a higher risk during surgery.

62.  The Health Care Review Subcommittee determined that the artificial urinary sphincter surgery did not meet the requirement of California Code of Regulations, title 15, § 3350(a), to only provide medical services that are medically necessary and supported by outcome data as effective medical care because the surgery was not reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and was not supported by health outcome data as being effective medical care in plaintiff's situation.

63.  The Health Care Review Subcommittee denied the requested surgery because the facts clearly showed that the surgery would put plaintiff at substantial risk of injury with very little likelihood of achieving the benefit he desired -- i.e., no longer needing to use a catheter -- and medically, the catheter could address plaintiff's incontinence.

64.  In the two years prior to October 16, 2014, the day of plaintiff's deposition, plaintiff had one infection or problem with blood in his urine due to the catheter, one in the year before

14

those two years, and one over three years ago -- for a total of three in five years -- but each one cleared up after two or three days.

65.  Plaintiff claims that wearing the catheter causes him stinging and sometimes throbbing-like pain in his penis, which causes him to wake up from sleeping about once a month. (Pl.'s Dep. at 32; 84 (ECF No. 36-2 at 12; 64).)

66.  However, plaintiff is able to get back to sleep.  (Pl.'s Dep. at 84 (ECF No. 36-2 at 64).)

67.  The pain is sometimes a little less, but it is always there.  (Pl.'s Dep. at 32 (ECF No. 36-2 at 12).)

68.  Plaintiff believes the artificial urinary sphincter would help with his pain because he would no longer have to wear the catheter.  (Pl.'s Dep. at 33 (ECF No. 36-2 at 13).)

69.  Plaintiff does not recall if doctors told him that an artificial urinary sphincter would relieve his stomach pain.  (Pl.'s Dep. at 30 (ECF No. 36-2 at 10).)

70.  It was plaintiff's understanding that the surgery would help with incontinence, and that he would possibly not have to use a catheter.  (Id.)

71.  Plaintiff was diagnosed with coronary artery disease, he received a stent prior to the prostate operation, and he has nitroglycerine tablets.  (Pl.'s Dep. at 77-78 (ECF No. 36-2 at 57-58).)

72.  Plaintiff has high blood pressure and gout, and a history of arthritis and Hepatitis C. (Pl.'s Dep. at 78-80 (ECF No. 36-2 at 58-60).)

73.  Plaintiff receives pain medication.  (Pl.'s Dep. at 83 (ECF No. 36-2 at 63).)

74.  Plaintiff is not claiming that any of the defendants in this case lied to him.  (Pl.'s Dep. at 87 (ECF No. 36-2 at 67).)

75.  There is no connection between plaintiff's hernia and receiving artificial urinary sphincter surgery.  (Pl.'s Dep. at 31-32 (ECF No. 36-2 at 11-12).)

76.  Plaintiff is not claiming any current mental complaints due to the issues in this action. (Pl.'s Dep. at 32 (ECF No. 36-2 at 12).)

77.  Plaintiff is 70 years old.  (ECF No. 36-12 at 2.)

1    VI.  Eighth Amendment Claims

2           A.  Legal Standards

3           The Eighth Amendment protects prisoners from inhumane conditions of confinement.

4    Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994).  To prevail on an Eighth

5    Amendment claim for deliberate indifference arising out of inadequate medical care, a plaintiff

6    must show "deliberate indifference" to his "serious medical needs."  Estelle v. Gamble, 429 U.S.

7    97, 104 (1976).  "This includes 'both an objective standard -- that the deprivation was serious

8    enough to constitute cruel and unusual punishment -- and a subjective standard -- deliberate

9    indifference.'"  Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

10           To meet the objective element of the standard, a plaintiff must demonstrate the existence

11   of a serious medical need.  Estelle, 429 U.S. at 104.  Such a need exists if failure to treat the

12   injury or condition "could result in further significant injury" or cause "the unnecessary and

13   wanton infliction of pain."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting

14   McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled in part on other grounds by

15   WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks

16   omitted).  A serious medical need exists if the failure to treat a prisoner's condition could result in

17   further significant injury or the unnecessary and wanton infliction of pain, including "[t]he

18   existence of an injury that a reasonable doctor or patient would find important and worthy of

19   comment or treatment; the presence of a medical condition that significantly affects an

20   individual's daily activities; or the existence of chronic and substantial pain."  McGuckin, 974

21   F.2d at 1059-60.

22           To satisfy the subjective element of deliberate indifference, the plaintiff must show that

23   "the official knows of and disregards an excessive risk to inmate health or safety; the official

24   must both be aware of facts from which the inference could be drawn that a substantial risk of

25   serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  A plaintiff

26   must establish that the course of treatment the doctors chose was "medically unacceptable under

27   the circumstances" and that they embarked on this course in "conscious disregard of an excessive

28   risk to plaintiff's health."  Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (internal

16

citations and quotations omitted).  Indifference may appear "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988) (citing Estelle, 429 U.S. at 106).

"[A] mere difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference."  Toguchi, 391 F.3d at 1058 (internal quotes and citation omitted); see also Brown v. Beard, 445 F. App'x. 453, 455 (3rd Cir. 2011) ("A professional disagreement between doctors as to the best course of treatment does not establish an Eighth Amendment violation.").  "Simply showing that another doctor in similar circumstances might have ordered different treatment," however, "only raises questions about medical judgment and does not show that the physician acted with a culpable mind greater than negligence."  Starbeck v. Linn County Jail, 871 F.Supp. 1129, 1144 (N.D. Iowa Dec. 12, 1994) (citing Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987)).  Instead, the plaintiff must not only show that a physician's course of treatment "was medically unacceptable under the circumstances," but that the physician chose it "in conscious disregard of an excessive risk to [the] plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); see also Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) ("It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent.").

B. Discussion

i. Objective Element

Defendants contend that plaintiff fails to meet the objective component under the Eighth Amendment because having to wear a catheter does not cause severe pain or further injury, and an artificial urinary sphincter is unlikely to eliminate the need for a catheter.

However, as set forth above, in order to meet the objective element, plaintiff must demonstrate the existence of a serious medical need.  Colwell, 763 F.3d at 1066.  Here, plaintiff suffers from incontinence, which a reasonable doctor or patient would find important and worthy of treatment, and would significantly affect an individual's daily activities.  The court finds that

17

1   plaintiff meets the objective element.

2                          ii.  <u>Subjective Element</u>

3                               a.  <u>Artificial Urinary Sphincter</u>

4          Plaintiff's case is unusual.  It is undisputed that plaintiff's initial prostate removal surgery

5   was "botched," but plaintiff is not challenging the initial surgery.  Plaintiff had at least two

6   subsequent procedures, both of which were also unsuccessful, but he is also not challenging those

7   procedures.  At bottom, plaintiff challenges the ultimate decision to deny him artificial urinary

8   sphincter surgery.  Plaintiff contends that the refusal to provide him with this procedure causes

9   him pain and impacts his activities of daily living because he is required to wear a condom

10  catheter as a result of his incontinence caused by the initial failed surgery.

11         First, the court acknowledges that it is difficult to have to wear a condom catheter and

12  cope with the issue of incontinence.  The court is sympathetic to plaintiff's plight, and wishes

13  there were a medical solution to permanently resolve his incontinence and the internal pain he

14  suffers.  But the record reflects that the artificial urinary sphincter procedure is not supported by

15  health outcome data as effective medical care in plaintiff's case, and the internal pain that

16  plaintiff concedes is the result of the initial "botched" surgery would not be resolved by the

17  artificial urinary sphincter.  Plaintiff adduced no evidence to the contrary.

18         Second, Dr. Fawcett's report confirms that the artificial urinary sphincter surgery is

19  complex and poses risks.

20         Further, the evidence shows that after reviewing plaintiff's medical records, including his

21  history of three unsuccessful procedures, as well as the literature about the artificial urinary

22  sphincter procedure, seven board certified physicians unanimously determined that the risks

23  outweighed the benefit of such a procedure.  Plaintiff adduced no medical evidence to the

24  contrary.  Plaintiff did not provide declarations or expert medical opinions from Dr. Naseer, Dr.

25  Beck, or Dr. Fawcett opining that the benefits of the artificial urinary sphincter surgery

26  outweighed the risks of the procedure, particularly in light of the three prior procedures used in

27  unsuccessful attempts to resolve plaintiff's incontinence, or that the continued use of a condom

28  catheter poses an excessive risk to plaintiff's health.

                                                    18

Although it appears undisputed that Dr. Naseer requested that plaintiff be provided the artificial urinary sphincter, and also on plaintiff's behalf appealed the decision to deny the procedure, plaintiff adduced no evidence demonstrating Dr. Naseer's experience and qualifications.  Plaintiff did not provide a declaration from Dr. Naseer attesting that in his medical opinion, after studying the procedure and reviewing plaintiff's medical records, including the three prior unsuccessful procedures, the artificial urinary sphincter procedure was required, or that the benefit of such procedure outweighed the associated risks.  But even assuming that Dr. Naseer's request was an informed decision that plaintiff should receive the procedure, the opinion of Dr. Fawcett demonstrates that there was a difference of opinion as to the benefits and risks, as well as the projected results of such a procedure.  Similarly, to the extent that Dr. Beck's progress note can be interpreted as a recommendation that plaintiff receive the procedure, such recommendation demonstrates a difference of opinion, particularly where it is undisputed that Dr. Beck did not discuss the complications and failure rates of the procedure with plaintiff.

b. Defendant Dr. Heatley

Plaintiff emphasizes that defendant Dr. Heatley informed plaintiff that he would receive the procedure if the MAR committee approved it, and argues that having Dr. Heatley serve on the MAR review committee was a conflict of interest because the MAR denied plaintiff the procedure.  (ECF No. 39 at 11.)  Plaintiff argues that defendant Dr. Heatley cannot claim he was willing to provide the procedure if the MAR committee approves it, but then serve on the MAR committee and deny the procedure, because it demonstrates that Dr. Heatley was biased. Defendants respond that Dr. Heatley was not willing to provide the procedure; rather, instead of denying the procedure outright, he decided to present the issue to additional medical personnel. (ECF No. 41 at 2.)  Thus, defendants argue that rather than showing bias, Dr. Heatley was willing to give plaintiff an additional chance to obtain the procedure.  (Id.)

Plaintiff fails to adduce evidence that Dr. Heatley was biased.  The record reflects that despite the initial May 9, 2011 denial of the artificial urinary sphincter procedure, in response to plaintiff's administrative appeal, Dr. Heatley placed plaintiff's appeal in the Health Care Appeals Office "to follow up with to ensure that [plaintiff] receive the artificial urinary sphincter

procedure, *if* the referral or procedure is approved by the Medical Authorization Review (MAR) Committee." (ECF No. 36-11, emphasis added.)  Defendants adduced evidence that the MCSP MAR is made up of a registered nurse and all the medical doctors at MCSP who are available to attend the committee meeting.  (ECF No. 36-17 at 1.)  Contrary to plaintiff's view that the MCSP MAR'S denial of the procedure demonstrates Dr. Heatley had a conflict of interest, the evidence shows that Dr. Heatley referred plaintiff's case to the MCSP MAR for review even after Dr. Heatley's initial denial.  Then, rather than deny the request outright, the MCSP MAR on which Dr. Heatley served, referred plaintiff's request for the procedure to the California Health Care Services Health Care Review Subcommittee.  Such actions, without more, do not constitute a conflict of interest or bias against plaintiff, but demonstrate a cautious approach to plaintiff's health care needs, and a willingness to have plaintiff's case reviewed by other medical professionals.  Plaintiff adduced no additional facts or evidence suggesting that Dr. Heatley was biased against plaintiff or had a conflict of interest that would preclude him from serving on the MCSP MAR committee.  Whether or not Dr. Heatley told plaintiff that Dr. Heatley was willing to perform the procedure if the MAR committee approved it is not a material issue of fact precluding summary judgment because the MCSP MAR referred the request to another level of review rather than deny the procedure outright.  The elevation of the request does not demonstrate deliberate indifference.  Dr. Heatley's willingness to perform the procedure if the MAR committee approved the procedure also cannot be viewed as deliberate indifference to plaintiff's serious medical needs.

For all of these reasons, defendant Dr. Heatley is entitled to summary judgment.

### c. Defendant Dr. Barnett

Defendant Barnett is the sole defendant who was involved in the final decision to deny plaintiff the artificial urinary sphincter surgery.  In his opposition, plaintiff contends that Dr. Barnett reviewed all the doctors' notes and recommendations of the specialists before she denied plaintiff the artificial urinary sphincter procedure, and argues that because Dr. Barnett is not a urologist, she is unable to adequately diagnose plaintiff's medical needs regarding his urinary problem.  (ECF No. 39 at 12.)  Defendants dispute plaintiff's characterization that the specialists

1    recommended that plaintiff have the artificial urinary sphincter procedure, and contend the

2    specialists simply discussed the procedure with plaintiff.  In any event, defendants contend that

3    the record reflects a difference of opinion as to whether plaintiff should receive the artificial

4    urinary sphincter procedure.

5            Here, plaintiff failed to rebut defendants' evidence that the artificial urinary sphincter

6    procedure is not supported by health outcome data as effective medical care for plaintiff.

7    Moreover, defendant Dr. Barnett was one of seven doctors who unanimously agreed that the

8    procedure should be denied.  The record demonstrates that the Subcommittee reviewed plaintiff's

9    medical records and evaluated medical literature concerning the procedure before reaching their

10   unanimous decision.  Although Dr. Barnett is not a urologist, she earned her medical degree from

11   Harvard Medical School, is a licensed physician and surgeon in good standing in the state of

12   California, and has more than thirty years' experience in the field of medicine with a special

13   interest in administrative medicine.  (ECF No. 36-20 at 1.)  Unlike Dr. Naseer, who also is not a

14   urologist, Dr. Barnett reviewed plaintiff's medical records and, along with the other

15   Subcommittee members, "considered relevant medical literature regarding the artificial urinary

16   sphincter procedure for someone with several prior failed procedures and surgeries to eliminate

17   incontinence."  (ECF No. 36-20 at 3.)  More significantly, six other doctors who served on the

18   Subcommittee also agreed that plaintiff should not undergo the procedure.  The fact that Dr.

19   Barnett is not a urologist does not preclude summary judgment.

20           Furthermore, this case is distinguishable from cases in which prison officials and doctors

21   deliberately ignored the express orders of a prisoner's treating physician.  See, e.g., Jett, 439 F.3d

22   at 1097-98 (finding a triable issue of fact as to whether a prison doctor was deliberately

23   indifferent to a prisoner's medical needs when he decided not to request an orthopedic

24   consultation as the prisoner's emergency room doctor had previously ordered); Hamilton v.

25   Endell, 981 F.2d 1062, 1067 (9th Cir. 1992) (finding a triable issue of fact as to whether prison

26   officials were deliberately indifferent to prisoner's serious medical needs when they relied on the

27   opinion of a prison doctor instead of the opinion of the prisoner's treating physician and surgeon),

28   abrogated in part on other grounds by Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1045

(9th Cir. 2002). Here, the progress notes of outside urologist Dr. Beck clearly state his equivocation: that he would rather have a second opinion. And, despite Dr. Naseer's subsequent request that plaintiff receive the procedure, Dr. Fawcett advised plaintiff that the artificial sphincter can fail, "erode the urethra or atrophy the urethra to become ineffective," and has "at least a 40% re-do rate." (ECF No. 36-12 at 2.) Plaintiff adduced no medical evidence to the contrary.

Importantly, the evidence demonstrates that plaintiff has been provided multiple medical procedures in an effort to resolve his incontinence, all of which have failed. Plaintiff's incontinence is presently treated by his use of a condom catheter. Plaintiff now seeks to have another procedure, which some doctors might pursue. But in light of plaintiff's medical history and the risks and potential failure of such procedure, Dr. Barnett and her colleagues on the Subcommittee denied the request, opting instead to continue the more conservative medical treatment by continuing to provide the condom catheter and pain medications. Although plaintiff disagrees with such decision, such disagreement does not rise to the level of deliberate indifference.

Therefore, for all of the above reasons, the undersigned finds that plaintiff failed to raise a genuine dispute of material fact as to whether defendant Dr. Barnett acted with deliberate indifference. See Toguchi, 391 F.3d at 1057-58, 1060 (deliberate indifference is a high legal standard, and is met only if each defendant knows of and disregards an excessive risk to the inmate's health). Dr. Barnett is also entitled to summary judgment.

### d.  Defendants Dr. Smith and Fong

As conceded in his deposition, the only basis for plaintiff's claims against defendants Dr. Smith and Fong is that documents bore their names, but were signed on their behalf by Dr. Heatley. Plaintiff adduced no further evidence that Dr. Smith or defendant Fong were responsible for denying plaintiff the artificial urinary sphincter surgery or other required medical care.

Based on defendant Fong's response to interrogatory no. 2, plaintiff contends that it was defendant Fong's practice to review inmate appeals with Dr. Heatley on a regular basis. (ECF No 39 at 14.) However, it is undisputed that defendant Fong is not a doctor and would not decide

medical issues on review of administrative appeals.  See Peralta v. Dillard, 744 F.3d 1076, 1086-87 (9th Cir. 2014) (en banc) (finding no reasonable jury could find deliberate indifference where a prison official with no medical expertise in the relevant field, acting in an administrative capacity, denied an inmate appeal for medical care after it was reviewed by qualified medical experts).[6]

Further, it is undisputed that MAR committees are staffed by all MCSP physicians who are available at the time of the meeting.  Dr. Smith declares that he researched the issue and does not believe that he was present at the MCSP MAR review committee that addressed plaintiff's appeal, and that is why Dr. Heatley signed the May 9, 2011 form for Dr. Smith.  (ECF No. 36-17 at 2.)  Plaintiff adduces no evidence to the contrary.

The record reflects that Dr. Heatley signed the second level appeal response, and was present at the MAR review committee.  Thus, Dr. Heatley is the individual responsible for plaintiff's claims herein, not defendant Dr. Smith or defendant Fong.  Defendants Smith and Fong are entitled to summary judgment.

e.  Defendant Zamora

The only opposition plaintiff offers as to defendant Zamora is that she had the authority to deny or grant inmate health care appeals and admits she is not a doctor and has no medical training,[7] and therefore she "cannot claim no knowledge now that there is an admission of the authority to deny or grant the medical appeals of inmates."  (ECF No. 39 at 12.)

Defendant Zamora partially granted plaintiff's appeal because the issue of whether to grant plaintiff the artificial urinary sphincter procedure was elevated to the Health Care Review Subcommittee, and their decision was still pending at the time Zamora issued the third level

---

[6]  Plaintiff argues that nonmedical staff should not be tasked to review medical appeals, but that because they are, they should equally be responsible for denying relief through the administrative appeals process.  However, defendant Fong appropriately delegated review of plaintiff's appeal to Dr. Heatley, and absent a link or connection to the alleged violation, no § 1983 liability can attach.

[7]  Plaintiff refers to defendant Zamora's answers to interrogatories but did not provide them. (ECF No. 39 at 12; *passim*.)

1   decision.  Because plaintiff's request was elevated to a higher level of review, there was no

2   further investigation or action for defendant Zamora to take.  In his deposition, plaintiff agreed

3   that he had no issue with Zamora wanting plaintiff to receive a response from the Subcommittee.

4   (ECF No. 36-2 at 56.)  Moreover, defendant Zamora is not a medical doctor, and she relied on the

5   seven board certified medical doctors who served on the Health Care Review Subcommittee to

6   determine whether the artificial urinary sphincter surgery was medically necessary.  Such reliance

7   was appropriate given plaintiff's complex medical history as well as the complexity of the

8   artificial urinary sphincter procedure.  See Peralta, 744 F.3d at 1086-87.

9        To the extent that plaintiff seeks relief against defendant Zamora because plaintiff

10   disagreed with Zamora's ruling on appeal Log No. MCSP-16-11-11076, this claim must fail.

11   Prisoners have no absolute constitutional right to have their grievances heard in a prison

12   administrative appeal system.  Although state statutes or regulations may give rise to

13   constitutionally-protected liberty interests that cannot be taken away without due process of law,

14   California prison regulations do not create such a liberty interest in an inmate grievance

15   procedure.  The regulations grant prisoners a purely procedural right and set forth no substantive

16   standards, see Cal. Code Regs. tit. 15, §§ 3084, et seq. (applicable to state prisons), and such

17   provisions cannot form the basis of a constitutionally cognizable liberty interest.  See also Smith

18   v. Noonan, 992 F.2d 987, 989 (9th Cir. 1993); Mann v. Adams, 855 F.2d 639, 640 (9th Cir.

19   1988).

20        For all of the above reasons, defendant Zamora is entitled to summary judgment.

21                          f.  Pain

22        In his deposition, plaintiff confirmed that his medical appeal addressed the issues of his

23   incontinence and the pain from wearing the catheter.  (ECF No. 36-2 at 44.)  It is undisputed that

24   the artificial urinary sphincter would not address or alleviate the internal pain plaintiff suffers

25   from the initial "botched" surgery.

26        The failure to respond to a prisoner's complaints of pain can be sufficient to support an

27   Eighth Amendment claim.  Snow v. McDaniel, 681 F.3d 978, 990 (9th Cir. 2012), overruled in

28   part on other grounds, Peralta, 744 F.3d at 1076; Clement v. Gomez, 298 F.3d 898, 904 (9th Cir.

1    2002).  However, deliberate indifference must be shown, and it is a high legal standard.  Toguchi,

2    391 F.3d at 1060 (quotation marks omitted).  "Under this standard, the prison official must not

3    only 'be aware of the facts from which the inference could be drawn that a substantial risk of

4    serious harm exists,' but that person 'must also draw the inference.'"  Id. at 1057 (quoting

5    Farmer, 511 U.S. at 837).  "'If a prison official should have been aware of the risk, but was not,

6    then the official has not violated the Eighth Amendment, no matter how severe the risk.'"  Id.

7    (quoting Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1188 (9th Cir. 2002)).

8         In his verified complaint, plaintiff refers to "pain and suffering" and "severe pain" (ECF

9    No. 1 at 4, 6, 7), but does not specify the location of such pain.

10        Plaintiff disputes defendants' position that he does not have pain or a significant

11   disability, and cites defendants' Exhibit 8 (ECF No. 36-9 at 2-4) as evidence that defendants were

12   aware of his pain and suffering.  (ECF No. 39 at 4.)  However, defendants' exhibit 8 is plaintiff's

13   administrative appeal, Log No. MCSP-16-11-11076, in which plaintiff sought the artificial

14   urinary sphincter procedure.  (ECF No. 36-9.)  In this appeal, signed May 24, 2011, plaintiff

15   recounts his medical history of unsuccessful procedures, and states:

16           With the removal of the prostate [plaintiff] was forced to use a
             Foley Catheter w/bag connected through his penis.  This surgery
17           was partially effective, however, [plaintiff] had continuous health
             problems and complications:  severe pain/suffering, bleeding,
18           abdominal pain and many "EMERGENCY" surgical procedures in
             an attempt to offer relief.
19

20   (ECF No. 36-9 at 2.)  Such statements do not make clear that he was suffering from pain from the

21   condom catheter.  On July 8, 2011, in his request for second level review, plaintiff states that he is

22   "still suffering with severe pain," (ECF No. 36-9 at 3), but does not indicate where the severe

23   pain was located.  Because plaintiff suffers from internal pain from the "botched" procedure, as

24   well as discomfort from the condom catheter, it is important to identify the location of plaintiff's

25   pain complaints.  Moreover, plaintiff's statements in these appeals are not verified, and he

26   provided no declaration in support of his opposition to the motion for summary judgment, or

27   ////

28   ////

25

1   medical records supporting his alleged complaints of pain.[8]  Plaintiff only provided answers to

2   interrogatories by defendants Fong, Barnett, and Heatley, and none of their responses address the

3   issue of plaintiff's pain related to his catheter.  (ECF No. 39 at 13-22.)

4          In his deposition, plaintiff testified that he experiences pain from the condom catheter, but

5   he fails to demonstrate that there is a question of material fact as to whether any named defendant

6   acted with deliberate indifference to plaintiff's pain complaints associated with the catheter.

7   Plaintiff described a stinging in his penis, and sometimes a "throbbing-like pain."  (ECF No. 36-2

8   at 12.)  He testified that the pain is constant, sometimes a little less, but always there.  (ECF No.

9   36-2 at 12-13.)  But it is undisputed that plaintiff is prescribed pain medications, and he testified

10  that he receives Tramadol three times a day for pain.  (ECF No. 36-2 at 63.)  Plaintiff provided no

11  medical records demonstrating that he presented with pain from the catheter and a defendant

12  refused or failed to treat such pain.  None of the defendants were plaintiff's treating physician or

13  nurse, and during his deposition, plaintiff concedes he has not talked to or had a conversation

14  with any of the defendants.  (ECF No. 36-2 at 66-67.)  Moreover, on those occasions where he

15  experiences an infection or problems with his skin associated with wearing the catheter, the

16  record reflects that plaintiff is treated with antibiotics or other appropriate medications.  It is

17  undisputed that plaintiff has had such issues only three times in five years, and each time the

18  problem cleared up after two or three days.

19         While plaintiff surely experiences discomfort by having to wear the condom catheter, he

20  fails to demonstrate he suffers severe pain from the catheter, or that the pain medications

21  provided are inadequate to address pain associated with the catheter.  Deliberate indifference is a

22  high legal standard and even gross negligence is insufficient to establish deliberate indifference to

23  serious medical needs.  See Wood, 900 F.2d at 1334.  Plaintiff fails to meet this high burden to

24  establish that any defendant acted with deliberate indifference to plaintiff's serious medical needs

25  _____

    [8]  On March 13, 2015, plaintiff was provided contemporaneous notice of the requirements for
26  opposing motions for summary judgment, including the requirement that he could not simply rely
    on the complaint, but "must set out specific facts in declarations, depositions, answers, to
27  interrogatories, or authenticated documents, as provided in Rule 56(c)."  (ECF No. 36-15 at 2,
    citing Rand v. Roland, 154 F.3d 952, 962-63 (9th Cir. 1998) (en banc).  Earlier, on May 6, 2014,
28  the court also provided him notice of the Rand requirements.  (ECF No. 24 at 4, 6.)

1   in connection with his pain complaints associated with the wearing of a catheter.  Plaintiff must

2   wear a catheter because of his incontinence and thus the provision of a catheter, which causes

3   discomfort, does not cause significant injury or the unnecessary and wanton infliction of pain.

g.   Hernia

4

5         In his complaint, plaintiff states that after he was referred to qualified specialists, each of

6   the defendants left him "with a hernia."  (ECF No. 1 at 7.)  This is the only mention of a hernia in

7   the complaint.  The pleading contains no factual allegations describing the hernia or the care or

8   lack of care plaintiff received for the hernia, or specifically connecting such care with a particular

9   named defendant.  (ECF No. 1, *passim*.)  In his opposition to the instant motion, plaintiff explains

10  that he got the hernia "from the [initial] botched procedure," and now claims, for the first time,

11  that defendants never addressed his hernia.  (ECF No. 39 at 4.)  No further factual allegations as

12  to the hernia, or to each defendant's involvement therewith, is provided in the opposition.  (ECF

13  No. 39, *passim*.)

14        In his deposition, plaintiff testified that there is no connection between the hernia and

15  receiving an artificial urinary sphincter.  (Pl.'s Dep. at 31 (ECF No. 36-2 at 11).)  Review of

16  plaintiff's administrative appeal Log No. MCSP-16-11076 confirms that plaintiff sought the

17  artificial urinary sphincter procedure and did not seek treatment for the hernia.  (ECF Nos. 36-9;

18  36-13.)

19        While, under limited circumstances, a plaintiff may add newly exhausted claims to an

20  existing action, see Rhodes v. Robinson, 621 F.3d 1002 (9th Cir. 2010) (authorizing amended

21  complaint containing newly exhausted claims based on related conduct that occurred after the

22  filing of the original complaint), generally "a prisoner must exhaust his administrative remedies

23  for the claims contained within his complaint before that complaint is tendered to the district

24  court," id. at 1004, citing McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002) (per curiam);

25  and Vaden v. Summerhill, 449 F.3d 1047, 1050 (9th Cir. 2006).

26        Plaintiff's complaint fails to allege facts demonstrating that any defendant was

27  deliberately indifferent to medical care for plaintiff's hernia.  Moreover, the gravamen of the

28  complaint was plaintiff's efforts to obtain the artificial urinary sphincter procedure and provided

27

1   no notice either to defendants or to the court that plaintiff challenged the care provided for the

2   hernia that resulted from the 2008 initial "botched" procedure.  In addition, plaintiff concedes that

3   there is no connection between the hernia and receiving an artificial urinary sphincter.  Finally,

4   it is undisputed that none of the defendants were responsible for treating plaintiff's medical

5   ailments.  Therefore, the undersigned declines to recommend that plaintiff be granted leave to

6   amend to raise claims concerning medical care for his hernia.

7           C.  Qualified Immunity

8           Because the undersigned finds that all defendants are entitled to summary judgment, the

9   issue of qualified immunity need not be addressed.

10          D.  State Law Claims

11          Under 28 U.S.C. § 1367(c)(3), district courts have discretion to dismiss state law claims

12  when a plaintiff's federal claims have been dismissed.  "In the unusual case in which federal law

13  claims are eliminated before trial, the balance of factors . . . will point toward declining to

14  exercise jurisdiction over the remaining state law claims."  Carnegie-Mellon Univ. v. Cohill, 484

15  U.S. 343, 350 n.7, 108 S. Ct. 614 (1988); Notrica v. Bd. of Sup'rs of County of San Diego, 925

16  F.2d 1211, 1213-14 (9th Cir. 1991).  District courts are not required to provide an explanation for

17  such decision.  Ove v. Gwinn, 264 F.3d 817, 826 (9th Cir. 2001).  Accordingly, the undersigned

18  finds that the district court should decline to exercise supplemental jurisdiction over plaintiff's

19  state law claims.  Plaintiff is informed that he may pursue his claim in state court pursuant to the

20  time limitations set forth in 28 U.S.C. § 1367(d).

21  VII.  Conclusion

22          In accordance with the above, IT IS HEREBY RECOMMENDED that:

23          1.  Defendants' motion for summary judgment (ECF No. 36) be granted; and

24          2.  The court decline to exercise supplemental jurisdiction over plaintiff's state law claims,

25  28 U.S.C. § 1367(c)(3), and dismiss such claims without prejudice.

26          These findings and recommendations are submitted to the United States District Judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

28  after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 15, 2016

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/aleo1673.msj

29